IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES S. D.[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Civil No. 23-cv-1596-RJD[2] |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM and ORDER

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits ("DIB") pursuant to 42 U.S.C. § 423.

## Procedural History

On April 9, 2021, Plaintiff protectively filed an application for DIB pursuant to Title II, alleging disability beginning on October 11, 2019, due to blood cancer, leg pain, back problems, degenerative disc disease, arthritis, difficulty standing and ambulating, and high blood pressure. (Tr. 78). Plaintiff's claim was denied initially on September 17, 2021, and upon reconsideration on December 6, 2021. (Tr. 99, 108). Plaintiff filed a written request for a hearing on December 17, 2021. (Tr. 115). On September 21, 2022, Administrative Law Judge ("ALJ") Katherine

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.  *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  (Doc. 14).

Jecklin held a hearing at which Plaintiff appeared with his attorney and testified.   (Tr. 34-62).   A vocational expert also testified.   (*Id.*).   The ALJ issued an unfavorable decision on October 27, 2022.   (Tr. 13-33).   The Appeals Council denied review on March 21, 2023, rendering the ALJ's decision the agency's final decision for purposes of judicial review.   (Tr. 1-7).   This timely action followed.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1.   The ALJ failed to support her residual functional capacity (RFC) finding with substantial evidence because she failed to build an accurate and logical bridge from the evidence to her conclusions.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statute.[3]   Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work?   20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404.

2

disabled.   A negative answer at any step, other than at step 3, precludes a finding of disability. The plaintiff bears the burden of proof at steps 1–4.   Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy.   *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Importantly, the Court's scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).   The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above.   She determined that Plaintiff met the insured status requirements through March 31, 2020 ("the date last insured")

and that he had not engaged in substantial gainful activity since October 11, 2019, the alleged onset date.  (Tr. 19).   The ALJ found that Plaintiff suffered from severe impairments of neuropathy and a history of polycythemia vera.  (Tr. 19).  The ALJ further found that Plaintiff's hypertension, obesity, degenerative disc disease of the lumbar spine, and plantar fasciitis/plantar fascial fibromatosis were all non-severe.  (Tr. 19-21).

The ALJ next concluded that Plaintiff's impairments did not meet or equal a listed impairment.  (Tr. 21).   Regarding Plaintiff's RFC, the ALJ found that Plaintiff retained the RFC "to perform medium work as defined in 20 C.F.R. § 404.1567(c), except he could occasionally climb ladders, ropes, and scaffolds [and he] could perform work requiring no exposure to hazards such as unprotected heights."  (*Id.*).

At step four, the ALJ found that through the date last insured, Plaintiff was able to perform his past relevant work as an operating engineer and livestock rancher.  (Tr. 26).  Alternatively, at step five, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, jobs existed in the national economy that Plaintiff could perform, including the representative jobs of industrial cleaner, counter supply worker, and laborer - stores.  (Tr. 28).  Accordingly, the ALJ found that Plaintiff was not disabled at any time from October 11, 2019, the alleged onset date, through March 31, 2020, the date last insured.   (Tr. 29).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by Plaintiff.

1.      **Agency Forms and Prior Denials**

Plaintiff was born in 1960 and was 59 years old on the date of the ALJ's decision, which is defined as an individual of advanced age on the date last insured.  (Tr. 28, 239).  Plaintiff first filed for DIB pursuant to Title II of the Social Security Act ("the Act"), 42 U.S.C., Chapter 7, on July 12, 2017, claiming a disability with an onset date of December 15, 2015, and a date last insured of March 31, 2017.  (Tr. 63-76).  The claim was initially, and upon reconsideration, denied, and thereafter, Plaintiff requested a hearing.  (*Id.*).  The Administrative Law Judge reviewing the application, Benjamin Burton ("ALJ Burton"), denied it on May 22, 2019, finding that Plaintiff had the medically determinable impairments of polycythemia vera and hypertension but concluding that he did not have a severe impairment or combination of impairments that significantly limited his ability to perform basic work-related activities for 12 consecutive months. (*Id.*).  The ALJ thus concluded that Plaintiff was not disabled for purposes of the Act "from December 15, 2016, through the date last insured, [March 31, 2017]."  (Tr. 66-67).  It appears that Plaintiff did not appeal that decision.  Instead, on April 9, 2021, Plaintiff filed this current application, alleging disability beginning on October 11, 2019 (more than two years since the last day insured of his prior application).  (Tr. 78).

In his Disability Report of his renewed application, Plaintiff listed the following conditions limiting his ability to work: blood cancer, leg pain, back problems, degenerative disc disease, arthritis, difficulty standing and ambulating, and high blood pressure.  (Tr. 78, 205).  In his Function Report, Plaintiff explained that he is unable to work because the longer he stands, the more his feet and legs hurt.  (Tr. 220).   He can do daily chores for 10 to 15 minutes, but then he needs to rest for 30 to 40 minutes.  (Tr. 221).   He does not have any problems with personal care.

5

(Tr. 221).   He can prepare meals.   (Tr. 222).    He does laundry, cleaning, and mowing on a riding mower.   (Tr. 222).   He can drive a car, go out alone, and shop in stores once a week for 30 minutes.   (Tr. 223).

### 2.    Evidentiary Hearing

Plaintiff appeared and testified by phone at a hearing held on September 21, 2022, before the ALJ, being represented by counsel.   (Tr. 34).   Plaintiff's counsel argued that there were new impairments since the prior unfavorable decision that supported a finding of disability, including diagnosis with lumber degenerative disk disease, fibromatosis, bilateral ankle and foot osteoarthritis, and plantar fasciitis, as well as ongoing treatment for peripheral neuropathy which imposed limitations on Plaintiff's functioning on a sustained basis.   (Tr. 39).   Plaintiff testified that between 2012 and 2016, he was self-employed, working at his farm.   He would work two to five hours a day and would lift up to 50 pounds.   (Tr. 42).   During the same timeframe, Plaintiff also worked as an operation engineer for several employers.   (Tr. 43).   Plaintiff testified he has been unable to perform a full-time job since October 2019 due to pain in his feet and legs, which worsened over time, prompting him to quit farming and rent out his farm.   (Tr. 34-44, 54).

Plaintiff further testified that during the relevant time for his application, he tried both over-the-counter and prescribed medication, including gabapentin, which did not help with his pain symptoms, and amitriptyline, which initially helped but started to wear off.   (Tr. 44, 52-53). Plaintiff further tried ointments, heat, and ice, as well as physical therapy for his back conditions, but he continued to experience pain in his leg.   (Tr. 44).   Plaintiff described his pain as a burning sensation on his feet, which he experiences even when he sits.   (Tr. 46).   When he is standing, though, the pain gets worse, and it feels like he is "walking straight on [his] bones."   (Tr. 46).   He

is further experiencing fatigue in his calf, which never stops.   (*Id.*).   Plaintiff testified that heat exacerbates his symptoms and that his pain has reached an intolerable level.   (*Id.*).

Regarding his daily activities, Plaintiff testified that during the relevant time, he lived on his farm alone, where he completed all household chores himself with breaks every 15 minutes or half hour.   (Tr. 48-49).   The breaks could be from 15 minutes up to an hour.   (Tr. 49).   Plaintiff was able to walk for up to 300 feet before the pain started to pick up.   (Tr. 50).   He was also able to lift up to 20 pounds.   (Tr. 53).   He mowed his lawn on a riding lawn mower, operated a weed eater for about 30 minutes at a time, cooked, cleaned, did laundry, bathed, dressed, shopped, drove around the farm on a four-wheeler looking for problems (he drove anywhere from 15 minutes to an hour checking on fences and cattle), watered cattle by filling a tank with water, fished for up a half hour, cleaned the fish, and watered his garden.    (Tr. 48-49, 51, 53, 55-57).   Plaintiff testified that he was spending four hours a day in his recliner.   (Tr. 54).

A vocational expert ("VE") also testified.   The VE classified Plaintiff's past jobs as follows: operating engineer, medium per the DOT and as performed, and livestock rancher, heavy per the DOT and medium as performed.   (Tr. 58).   The VE further testified that a person with Plaintiff's RFC assessment could still perform Plaintiff's past work, the livestock rancher as actually performed, and the operating engineer as actually and generally performed, and could also perform the representative jobs of industrial cleaner, counter supply worker, and laborer - stores.
 (Tr. 58-59).   However, the VE also clarified that any medium level work would be eliminated for such an individual if he had to spend half the day reclined or was required to switch between sitting and standing positions every 30 minutes.   (Tr. 60).

### 3.    Relevant Medical Records

Plaintiff visited oncologist Dr. Rodriguez every six months for routine monitoring of blood cancer.  (Tr. 361).   He was treated with medication and blood draws (phlebotomies).  (Tr. 361). Plaintiff's condition was stable, and he had not required phlebotomies since 2014.  (Tr. 361). During a visit with Dr. Rodriguez in September 2018, he complained of "discomfort" in his legs that had been ongoing for over ten years.  (Tr. 362).   He reported the pain "comes and goes" and was most bothersome when he was inactive rather than when he worked and moved around.   (Tr. 362).

In January 2019, Plaintiff visited his primary care physician, Dr. Fulton, with complaints of leg pain.  (Tr. 313).    He reported that his pain improved with medication and that he was able to stand for two hours, as opposed to only twenty minutes, before experiencing moderate discomfort.  (*Id*.).   Dr. Fulton ordered a refill of Plaintiff's pain medication and instructed him to follow up in six months.  (*Id*.).    In February 2019, Plaintiff had a routine follow-up visit with Dr. Rodriguez, where he reported the pain in his legs was "much better" since he began nerve pain medicine (gabapentin).  (Tr. 362).   In May 2019, Plaintiff saw Dr. Roger Fulton and again complained of lower extremity pains.  (Tr. 313).   Plaintiff reported that it began in his feet and radiated up his legs.  (*Id*.).   He reported that it began within his first few steps in the morning and that his legs were tired and weak.  (*Id*.).   He also complained of shortness of breath upon exertion. (*Id*.).   Dr. Fulton increased Plaintiff's gabapentin dose and referred him to podiatry.  (*Id*.).

Between June and September 2019, Plaintiff visited podiatrist Dr. Whittenburg six times. (Tr. 327).   During the first visit in early June 2019, Plaintiff complained of longstanding pain on the bottoms of both feet that radiated up the back of his legs and had been occurring over the past

20 years.  (Tr. 341).  His physical exam showed Plaintiff had a planus foot type (flat feet) bilaterally but demonstrated normal strength (5/5) and grossly intact sensation.  (Tr. 342).  An x-ray of both feet revealed no abnormalities.  (Tr. 342).  He was diagnosed with plantar fascial fibromatosis and osteoarthritis of his feet/ankles, although x-rays were unremarkable.  (Tr. 342). Removable strappings were applied to each foot for pain relief.  (Tr. 343).  During the second visit in late June, Plaintiff reported no change from the previous visit and was prescribed steroids for his symptoms.  (Tr. 339-40).  In early July 2019, Plaintiff presented again to Dr. Whittenburg for a follow-up on his foot pain.  (Tr. 336).  Plaintiff reported that he could not tolerate strapping due to irritation and rash on top of his feet but noted that he saw improvement with the steroid medication.  (*Id.*).  Later that month, Plaintiff saw Dr. Whittenburg again and reported that since starting over-the-counter arch support, his foot pain had improved but had not been resolved. Plaintiff was also fitted for orthotics   (Tr. 338).  Plaintiff returned to Dr. Whittenburg in August 2019, complaining of an issue with his right ankle (lateral side) that had begun two weeks earlier. (Tr. 331).  Plaintiff's right ankle showed swelling, redness, and pain, which Plaintiff stated was getting better with heat, over-the-counter medication, and elevation at home.  (*Id.*).  Plaintiff also picked up his orthotics and reported no change to his bilateral foot pain since the last visit.  (*Id.*). When Plaintiff saw Dr. Whittenburg again in September, he reported that the orthotics were "helping some," although he had some remaining pain.  (Tr. 328).  Dr. Whittenburg prescribed a short course of steroids for his symptoms.  (Tr. 329).    It appears that Plaintiff did not return to Dr. Whittenburg thereafter.

However, in later September 2019, Plaintiff had a follow-up visit with Dr. Rodriguez, where he reported continued discomfort in his legs and that he stopped taking his pain medicine

(gabapentin) because he was no longer seeing improvement with it.   (Tr. 361-62).   His cancer was deemed stable at both visits, and he was advised to continue his cancer medication.   (Tr. 361-62).

In early October 2019, Plaintiff presented to the emergency department a few days before his alleged onset date, complaining of right lower back and radicular pain following a recent minor motor vehicle collision a few days ago.   (Tr. 269).   Plaintiff reported that he had not had any issues immediately following the accident and had even gone fishing over the weekend, but later began to experience progressively worsening pain.   (*Id*.).   Examination showed no bony point tenderness or step-offs, and he actually reported improvement in his pain with palpation of the right paraspinal muscles.   (*Id*.).   His strength and sensation were normal.   (Tr. 270-71).   An x-ray of the spine showed only mild degenerative changes, primarily at the L5-S1 level and the sacroiliac (SI) joint.   (Tr. 272).   Plaintiff reported his symptoms improved with pain medication during his hospital stay.   (Tr. 272).   He was diagnosed with lumbar strain and discharged with over-the-counter pain medication, a muscle relaxant, back exercises, and instructions to follow up with his primary care physician in three days.   (Tr. 272, 279).

Plaintiff followed up with Dr. Fulton in late October.   (Tr. 312).   He described that his lower back pain was improving but was not resolved.   (*Id.*).   The physical examination showed 5/5 (normal) motor strength, negative straight leg-raise testing, and normal reflexes.   (*Id.*).   He was assessed with lumbar radiculopathy and was prescribed meloxicam and Flexeril.   (*Id.*).   On February 19, 2020, Plaintiff presented again to Dr. Fulton's office with complaints of chronic low back pain, and refills for his hypertension and low back pain medication were ordered.   (Tr. 315).

10

On March 11, 2020, Plaintiff returned to Dr. Rodriguez for a follow-up visit.   (Tr. 376).
Plaintiff's hematocrit (red blood cells) was in the normal range (45%).   Dr. Rodriguez noted that
Plaintiff "[c]ontinued to do well," had "no complaints or problems," and "[r]emained very active."
(*Id*.).   Dr. Rodriguez also noted that Plaintiff's peripheral neuropathy over both lower extremities
remained "unchanged from before."   (*Id.*).

On July 24, 2020, after the last day insured, Plaintiff had a follow-up visit with Dr. Fulton.
(Tr. 311).   Dr. Fulton noted Plaintiff was doing well overall and did not complain of his chronic
lower back pain but had occasional knee pain and swelling.   (Tr. 311).   The concurrent
examination was grossly normal, but Dr. Fulton started Plaintiff on Tramadol.   (*Id*.).

At another check-up in September 2020 (about six months after Plaintiff's date last
insured), Dr. Rodriguez noted that Plaintiff was still having discomfort in the bottom of his feet.
(Tr. 390).   Dr. Rodriguez prescribed a trial of pain medication (gabapentin) to address Plaintiff's
continued leg discomfort, noting, however, that Plaintiff had tried the same medication in the past
and had developed some side effects.   (*Id.*).   Plaintiff was noted as "fully ambulatory."   (Tr. 390-
92).   In October 2019, at a telemedicine visit, Dr. Rodriguez instructed Plaintiff to continue the
pain medication at an increased frequency of twice per day.   (Tr. 398-404).   Dr. Rodriguez
further noted that Plaintiff was positive for headaches and peripheral neuropathy over both lower
extremities, which was "unchanged from before."   *Id.*

### 4.    Medical Opinions

Oncologist Dr. Rodriguez provided a medical source statement in September 2022,   nearly
two years after the date last insured.   (Tr. 464-68).   Dr. Rodriguez stated Plaintiff was diagnosed
with blood cancer and neuropathy in both legs and suffered from burning pain from the knees

down that was caused by standing and walking.   (Tr. 464).   He found Plaintiff could walk about one block, sit 6 hours out of an 8-hour workday, and stand/walk less than 2 hours total out of an 8-hour workday.   (Tr. 465-66).   He further found Plaintiff could lift 10 pounds frequently and up to 50 pounds occasionally.   (Tr. 466).   He opined Plaintiff needed to walk around every hour for about 15 minutes and needed a job that allowed him to shift positions at will.   (Tr. 466).   He also opined Plaintiff could frequently look down, turn his head right or left, look up, and hold a static position, but did not provide assessments related to postural activities.   (Tr. 467).   He concluded Plaintiff would be absent from work daily as a result of his impairments.   (Tr. 467).

### 5.     State Agency Consultants' Opinions

In September 2021, Dr. Vautrain found Plaintiff had severe impairments of disorders of the skeletal spine and hypertension, but he did not make findings regarding Plaintiff's functional limitations because he found there was insufficient evidence in the file to establish medically determinable impairments prior to the date last insured of March 31, 2020.   (Tr. 80).

In December 2021, Dr. Green-Hill found lumbar spinal stenosis to be a severe impairment, but she also did not make findings regarding Plaintiff's functional limitations due to insufficient evidence to fully evaluate his impairments.   (Tr. 89).

### <u>Analysis</u>

Plaintiff argues that the ALJ failed to provide substantial support for her conclusion that Plaintiff was capable of performing medium-level work, requiring standing or walking for approximately 6 hours in an 8-hour workday.   While not clearly articulated in his brief, it appears that Plaintiff makes a two-fold challenge to the ALJ's determination.   First, Plaintiff appears to target the ALJ's discrediting of Plaintiff's allegations of subjective symptoms.   Second, Plaintiff

takes issue with the ALJ's weighing of Dr. Rodriguez's medical opinion regarding Plaintiff's functional limitations.   The Court will address its challenge in turn.

### 1. Reliability of Plaintiff's Subjective Symptoms

The Court first looks at the ALJ's assessment of Plaintiff's subjective symptoms. Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is patently wrong, meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (citation and quotation marks omitted).   "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.*   The findings of the ALJ as to the accuracy of the plaintiff's allegations are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).   However, Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005) (citation omitted).   The "lack of medical evidence supporting the severity of a claimant's symptoms is insufficient, standing alone, to discredit her testimony." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) (citation omitted).

Here, the ALJ concluded that Plaintiff's alleged intensity, persistence, and limiting effects of his feet and leg pain are "not entirely consistent with the objective medical evidence and other evidence in the record." Tr. 23.   Explaining her conclusion, the ALJ noted:

> The only real ongoing complaint associated with [Plaintiff's polycythemia] was discomfort in his feet, again a condition which had been present for several years, well before the alleged onset date. While the claimant testified at the hearing that the pain worsened, prompting him to stop working, the treatment records do not support any significant changes. They do show ongoing complaints and treatment for foot pain, although his provider continued to note that the claimant was active

and able to manage his activities of daily living. Exhibit B7F. The claimant even acknowledged at the hearing that he did his own household chores, worked in his yard, watered his cattle, and went fishing, all indicative of his physical abilities. Testimony. More importantly, the evidence does not demonstrate that his lower extremity neuropathic pain caused any abnormalities of gait, strength, or range of motion, as discussed above.

Tr. 24.

Notably, the ALJ primarily based her conclusion on the absence of any medical record showing any significant changes since the denial of Plaintiff's prior DIB application. *See, e.g.*, Tr. 23 ("The claimant had previously been found not disabled just a few months prior to the alleged onset date in this claim.  As discussed in greater detail here, the record shows little in the way of objective medical evidence to support significant changes from the prior denial. Instead, his complaints and treatment remained relatively static"); Tr. 24 ("The only real ongoing complaint associated with this condition was discomfort in his feet, again a condition which had been present for several years, well before the alleged onset date.  While the claimant testified at the hearing that the pain worsened, prompting him to stop working, the treatment records do not support any significant changes.").

It is true that the prior decision denying Plaintiff's initial DIB application is *res judicata* and stands as a finding that Plaintiff was not disabled between December 15, 2015, and March 31, 2017.  *See Groves v. Apfel,* 148 F.3d 809, 810 (7th Cir. 1998).   However, the "first ALJ's finding [is] a binding determination with respect to [Plaintiff]'s eligibility for disability benefits for that time period" and "has no effect" on Plaintiff's subsequent application.  *Rucker v. Chater*, 92 F.3d 492, 495 (7th Cir. 1996); *see also Groves*, 148 F.3d at 810 ("a claim that one [was disabled in March 2017] is not the same as a claim that one [was disabled in October 2019]").   This is especially true "when the disabling condition is progressive; for in that event there is no necessary

inconsistency in finding an applicant not disabled at time *t* but disabled at *t*+1." *Groves*, 148 F.3d at 810. At the same time, evidence that was considered in the prior proceeding and found not "strong enough *by itself* to establish disability" might still be considered at the later proceeding to "reinforce or illuminate or fill gaps in the evidence developed." *Id.* at 811 (emphasis in the original).

The Court notes, however, that the *res judicata* effect of the prior unfavorable decision covers the period up through March 31, 2017, Plaintiff's last day insured for his prior application—not through May 22, 2019, the day of the prior unfavorable ruling as the ALJ suggested in her decision. *See* Tr. 71; Tr. 23 ("The claimant had previously been found not disabled just a few months prior to the alleged onset date in this claim"). Here, the ALJ started from the proposition that Plaintiff was not disabled as of May 2019, the day of the prior unfavorable ruling, and concluded that Plaintiff was still not disabled because there was insufficient evidence of a significant change to his condition since that time. Tr. 23-24. The ALJ did so without citing any evidence considered in the prior proceeding. Tr. 22-24. In fact, the earliest medical record the ALJ cited in her decision is from September 2018. Tr. 23. By doing so, it appears that the ALJ went one step further and did not only require Plaintiff to show disability for the period of October 2019 through March 31, 2020, but also to show that there was a significant change in his condition since the prior unfavorable ruling. The Court finds this approach problematic because the prior unfavorable ruling could simply mean that the evidence before ALJ Burton was not "strong enough *by itself* to establish disability." *See Groves*, 148 F.3d at 811. In fact, ALJ Burton noted in his decision that there was insufficient evidence to assess Plaintiff's work-related limitations as of March 31, 2017. Tr. 71.

15

Turning to the ALJ's assessment of the medical record, at first glance, the ALJ went over the record in detail.  However, a review of the cited record does not substantially support her conclusion of inconsistency with Plaintiff's allegations regarding the intensity of his leg and foot pain.  The ALJ acknowledged that, during the relevant time, Plaintiff consistently complained of neuropathic discomfort in his lower extremities.  Tr. 23.  With the exception of a single notation in Plaintiff's medical record from September 2018, a year prior to his onset day, which associated his pain mostly with him staying inactive, the medical record does not support the ALJ's conclusion that Plaintiff's condition during the six months at issue was "primarily associated with inactivity."  Tr. 23.  In fact, the ALJ cited Plaintiff's medical record from January 2019, where Plaintiff noted that after initiating nerve pain medication, he was able to stand for two hours before experiencing moderate discomfort.  Tr. 313.  Importantly, what is missing from the ALJ's decision is the portion of that medical record indicating that without pain medication, Plaintiff was only able to stand for twenty minutes.  Tr. 313.  This is important in light of the fact that Plaintiff had, from time to time, discontinued the pain medication due to experiencing side effects or due to the medication wearing off.  Tr. 390; 23 ("the claimant declined Gabapentin at that time due to lack of efficacy").  Even with medication, however, the cited record does not support the ALJ's conclusion that Plaintiff was capable of standing or walking for approximately 6 hours in an 8-hour workday.

The ALJ then discussed Plaintiff's visits to his podiatrist, Dr. Whittenburg, to whom Plaintiff was referred due to the ongoing leg and foot pain.  Tr. 23.  The podiatrist diagnosed Plaintiff with plantar fasciitis/plantar fibromatosis and prescribed him orthotic implants.  The ALJ pointed to the fact that during his podiatrist visit, Plaintiff appeared not to be in any acute distress

and had no swelling, infections, strength, or sensory deficits.  *Id.*  However, the ALJ did not explain how these findings are inconsistent with Plaintiff's allegations of leg and foot pain after standing or walking for over 15 or 30 minutes.   Even more, the ALJ did not include in her record the fact that, between June and September of 2019, Plaintiff visited Dr. Whittenburg's office six times for his ongoing leg and foot pain.   Tr. 22-24, 327.   Despite trying several different treatments, including steroids and nerve medication, strapping, over-the-counter arch support, and orthotics, some of which provided some relief, Plaintiff continued to report leg and foot pain. This is not only consistent with Plaintiff's testimony, but it further raises the question of why Plaintiff would need to see a specialist if his leg and foot pain had remained unchanged.

Next, the ALJ discussed Plaintiff's visit to his oncologist in September 2019, where Plaintiff reported doing well overall but still complained of discomfort in his feet.   Tr. 23.   The ALJ noted that the pain medication was discontinued due to the lack of efficacy but noted that Plaintiff still "remained at least somewhat active at that time because he had gone fishing just a few days earlier."   Tr. 23.    As Plaintiff clarified at the hearing, however, during the relevant time period, he was able to fish for up to a half hour, which is consistent with his allegations that he could not stand or walk for more than 15 to 30 minutes.   Tr. 48-49, 51, 53, 55-57.   Again, there is nothing inconsistent between the cited medical record and Plaintiff's testimony.

The ALJ then referred to the emergency department visit, where Plaintiff denied weakness in any extremity and demonstrated normal strength and full sensation in the bilateral lower extremities.   It is again unclear how this contradicts Plaintiff's allegations of leg and foot pain after walking or standing in excess of 15-30 minutes.   The ALJ further inaccurately stated that the emergency room medical record "has no mention of any abnormality of gait," where, in fact,

Plaintiff reported to the ER with complaints "of right lower back pain that radiate[d] to his right pelvis and right leg" and which got "worse whenever he trie[d] to move his right leg."  (Tr. 269).

The ALJ continued citing the medical record from Plaintiff's follow-up visit to his oncologist in March 2020, just before his date last insured.  Tr. 24.  Dr. Rodriguez noted that Plaintiff "remain[ed] very active," and had no "complaints or problems," but continued to report peripheral neuropathy over both lower extremities "unchanged from before."  Tr. 376-77.  While the notation that Plaintiff remained active and did not report any complaints is facially inconsistent with Plaintiff's alleged subjective symptoms, the general nature of those statements, coupled with the notation that Plaintiff's peripheral neuropathy over both lower extremities remained "unchanged," do not provide substantial support to the ALJ's conclusion.

The ALJ's final citation to the records after the date last insured also does not support her conclusion of inconsistency.  Tr. 24.  Plaintiff continued to report neuropathic discomfort at the bottom of his feet and tried nerve medication again, which, however, was later discontinued due to lack of benefit.  *Id.*  Further, throughout her analysis, the administrative law judge noted that Plaintiff was "fully ambulatory" during his medical visits, but this finding again is not inconsistent with Plaintiff's testimony that he could stand or walk for up to 15 or 30 minutes.

The Court further finds problematic the ALJ's reliance on Plaintiff's continued ability to carry out his daily activities despite his alleged leg and foot pain.  Tr. 22-24.  The ALJ noted that Plaintiff was capable of doing the household chores on his own without help "but called his brother for assistance with heavy things like tree limbs."  Tr. 23   As the ALJ, however, noted, Plaintiff required a lot of breaks while performing the household chores, with Plaintiff testifying that those breaks were every 15 or 30 minutes and could last up to an hour.  Tr. 49.  Similarly, the fact that

18

Plaintiff was able to drive around his four-wheeler for up to an hour, operate a weed eater for about 30 minutes at a time, mow his lawn on a riding lawn mower, or fish for up to half an hour says nothing about his ability to be standing or walking for approximately 6 hours in an 8-hour workday.

The Court finds *Engstrand v. Colvin* instructive, if not directly on point. 788 F.3d 655 (7th Cir. 2015). There, the Seventh Circuit found that the administrative law judge's credibility finding in a social security disability case involving a 52–year–old former dairy farmer diagnosed with neuropathy and osteoarthritis was patently wrong. *Id.* at 661–62. The claimant there had testified that he could not stand for more than 30 minutes, that he needed to frequently alternate between sitting and standing, and that while he was able to do some chores, including driving his family to outdoor activities and operating a tractor at the family-owned farm, he had to take breaks in the midst of those activities. *Id.* The ALJ suggested that the claimant was a "part-time farmer," discredited the claimant's testimony of disabling pain, and finally found the claimant capable of performing "medium" work with some additional limitations. *Id.* at 659; 661–62. The court disagreed, noting that the administrative law judge "failed to understand that working sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity." *Id.* at 661. The court went on to cite a long list of relevant authorities from the Seventh Circuit standing for the same proposition. *Id.* (citing *Scrogham v. Colvin,* 765 F.3d 685, 700 (7th Cir.2014); *Moore v. Colvin,* 743 F.3d 1118, 1126 (7th Cir.2014) (ALJs must recognize that "full-time work does not allow for the flexibility to work around periods of incapacitation"); *Roddy v. Astrue*, 705 F.3d 631, 638-39 (7th Cir.2013) (claimant who "pushed herself to work part-time and maintain some minimal level of financial stability, despite her pain," was not precluded from establishing disability)). Notably, the Court emphasized that the

claimant's "complaints of severe pain stemming from his neuropathy [did not have to] be confirmed by diagnostic tests" and further criticized the administrative law judge's reliance on the claimant's sporadic use of medications in light of the claimant's testimony that sufficiently explained the reasons for discontinuing it. *Id.*

Like in *Engstrand*, the ALJ's citation to Plaintiff's medical record and daily activities in this case does not support her discrediting of Plaintiff's allegation regarding his leg and foot pain and his inability to stand in excess of 15 to 30 minutes. It further appears that the credibility determination affected the ALJ's findings as to the extent of Plaintiff's limitations, which impacted the outcome at step five. Specifically, at the hearing, the VE testified that any medium-level work would be eliminated for an individual with limitations similar to the ones the Plaintiff alleged (but the ALJ did not accept), including the need to spend half the day reclined or being required to switch between sitting and standing positions every 30 minutes. Tr. 60. Because the ALJ failed to give good reasons grounded in the evidence for her decision not to credit Plaintiff's allegations, the Court concludes the credibility determination was erroneous and cannot be deemed harmless. The erroneous credibility determination requires remand. *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) ("An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding.").

**2. The ALJ's assessment of Dr. Rodriguez's medical opinion.**

Plaintiff further appears to challenge the ALJ's weighing of Dr. Rodriguez's medical opinion regarding Plaintiff's functional limitations and specifically her failure to "cite to any medical report or opinion that contradicts Dr. Rodriguez's opinion." An ALJ must consider the

following factors when evaluating the medical opinion from a medical source: supportability; consistency; relationship with the claimant, including the length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relations; specialization; and any other factors that tend to support the medical opinion, including evidence that the medical source is familiar with other medical evidence or has an understanding of social security policies.   20 C.F.R. §§ 404.1520c(c), 416.920c(c).   The most important factors are the supportability and consistency of the opinion. 20 C.F.R. §§ 404.1520c(a), 416.920c(a).   Although the ALJ must consider all of these factors, she does not need to discuss each factor in her own opinion; the ALJ only needs to discuss the supportability and consistency factors.   20 C.F.R. §§ 404.1520c(b), 416.920c(b). "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion," while "consistency assesses how a medical opinion squares with other evidence in the record."   *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022) (citing 20 C.F.R. §§ 404.1520c(b)(1), (2)).   A minimal articulation of the ALJ's reasoning for assessing a medical opinion will suffice so long as the ALJ considers the regulatory factors and "builds a logical bridge from the evidence to [her] conclusion." *See Angie S. v. Kijakazi*, 21 C 5978, 2022 WL 17093363, at *6 (N.D. Ill. Nov. 21, 2022) (citation and internal quotation marks omitted).

Here, the only medical opinion of record to assess Plaintiff's functional limitations came from Plaintiff's oncologist, Dr. Rodriguez, who opined that Plaintiff could walk one block without rest or severe pain, sit at least 6 hours out of an 8-hour work day, and stand/walk less than 2 hours out of an 8-hour work day.   Tr. 466.   Dr. Rodriguez further opined that Plaintiff would need to

walk around every hour for about 15 minutes and needed a job that allowed him to shift positions at will. *Id.* The record does not include a consultative examination and the two state medical consultants opined that at the time they reviewed the record, there was insufficient evidence to assess Plaintiff's functional limitations. *See* Tr. 25; Tr. 80, 89.

The ALJ found Dr. Rodriguez's opinion unpersuasive concerning Plaintiff's limitations that would preclude him from performing medium work, including time limitations in sitting or standing/walking and the need for alternating between sitting and standing at will or walking around during the day. Tr. 26. The ALJ first found the opinion unsupported on the basis that Dr. Rodriguez simply listed the Plaintiff's diagnosis without providing an explanation as to why the diagnosis supported the degree of the opined limitations. Tr. 26. However, as Plaintiff's brief correctly notes, Dr. Rodriguez did not simply list Plaintiff's diagnosis. Rather, he specifically stated in his medical opinion that Plaintiff's symptoms included "pain bilateral lower extremities" and that Plaintiff's pain was in his "bilateral lower extremities from knees down, burning pain precipitated by standing and walking." Tr. 464  It is unclear what additional explanation the ALJ required from Dr. Rodriguez in support of his opined limitations.

The ALJ further concluded that Dr. Rodriguez's assessment was inconsistent "with his own treatment notes, which showed excellent response to medication, no need for phlebotomy, and relatively consistent treatment." Tr. 26. First, the Court finds it problematic that in support of her conclusion, the ALJ cited Dr. Rodriguez's medical record, as a whole, without pinpointing any specific excerpts that supported her opinion. While the ALJ does not need to identify all the evidence considered in arriving at this conclusion, some elaboration as to the inconsistency must be provided. *See McKnight v. Kijakzi*, Case No. 20-cv-5971, 2022 WL 4132448, at *18 (N.D. Ill.

Sept. 12, 2022) (ALJ properly evaluated physician's opinions and explained that the opinion was both supportable and consistent with the record as a whole and the ALJ elaborated on both factors by citing specific medical findings in the record).

Further, while the Court generally agrees with the ALJ's assessment as to the treatment and development of Plaintiff's polycythemia diagnosis, it appears that it mischaracterizes Plaintiff's peripheral neuropathy treatment.  As set forth above in more detail, Plaintiff's continued leg and foot discomfort, as well as the inefficacy of some of the prescribed medication, is well documented in Dr. Rodriguez's medical records.  *See, e.g.*, Tr. 361-62 (Plaintiff reported continued discomfort in his legs and advised that he stopped taking his prescribed medicine (gabapentin) because he was no longer seeing improvement with it; Tr. 376-77 (Dr. Rodriguez noted that Plaintiff "remain[ed] very active," and had no "complaints or problems," but continued to report peripheral neuropathy over both lower extremities "unchanged from before"); Tr. 390-92 (Plaintiff was still having discomfort in the bottom of his feet, and Dr. Rodriguez prescribed a trial of pain medication);  Tr. 398-404 (Dr. Rodriguez instructed Plaintiff to continue the pain medication at an increased frequency of twice per day).  The ALJ further referenced, in general, Dr. Rodriguez's treatment notes that Plaintiff was active and able to manage his activities of daily living and concluded that those notes are inconsistent with the opined limitations.  Again, the Court finds it problematic that the ALJ did not reference any specific portions of the medical record that supported her conclusion.  More importantly, for the reasons set forth above regarding the ALJ's credibility assessment of Plaintiff's subjective symptoms, Plaintiff's daily activities did not appear to be inconsistent with the opined limitation.  Accordingly, the Court finds that the ALJ erred in not considering Dr. Rodriguez's opined limitations because her findings on the issues of

consistency and supportability are not supported by substantial evidence.   Accordingly, remand is required.

The Court stresses, however, that this Order should not be construed as an indication that the Court believes Plaintiff was disabled during the relevant period or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

<u>**Conclusion**</u>

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and consideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).   The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED: September 16, 2024**

_s/ Reona J. Daly_
**Hon. Reona J. Daly**
**United States Magistrate Judge**

24